United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SOHEYL YOUSEFISAHI,
Plaintiff,

v.

JOSEPH B. EDLOW,
Defendant.

Case No. 25-cv-09728-LJC

**ORDER RESOLVING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 40, 41

## I. INTRODUCTION

Plaintiff Soheyl Yousefisahi brings this action against Defendant Joseph Edlow, Director of U.S. Citizenship & Immigration Services (USCIS), to compel resolution of Plaintiff's I-485 application to adjust status to permanent residence. The parties filed cross-motions for summary judgment. The Court heard argument on August 25, 2026 and allowed the parties to file supplemental declarations and briefing, which have now been submitted. For the reasons discussed below, the parties are ORDERED to file a status report attaching a declaration from USCIS no later than October 26, 2026. The parties' Motions for Summary Judgment are otherwise DENIED. The Court will set this case for a bench trial if it is not resolved by the time of the parties' next status report.[1]

## II. BACKGROUND

Plaintiff, a national of Iran, was granted asylum by an immigration judge on January 13, 2023. ECF No. 39 at 126–30. Consistent with the Immigration and Nationality Act, which allows asylees to apply to adjust status to permanent residence one year after receiving asylum, Plaintiff

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

filed an I-485 application to adjust status on February 9, 2024. Compl. (ECF No. 1) ¶ 2; Answer (ECF No. 38) ¶ 2. Plaintiff brought this action on November 12, 2025 alleging unreasonable delay in adjudicating that application. USCIS interviewed Plaintiff in connection with his application on April 29, 2026. ECF No. 32 at 2–3. On May 18, 2026, this Court denied a motion to dismiss for lack of subject matter jurisdiction, holding that USCIS's duty to adjudicate Plaintiff's application within a reasonable time is not discretionary, and therefore does not implicate the jurisdiction-stripping statute 8 U.S.C. § 1252(a)(2)(B). *See generally id.* Plaintiff's application has now been pending for more than thirty-one months, or more than two and a half years.

Plaintiff brings claims under the mandamus statute and the Administrative Procedure Act (APA). When a plaintiff seeks to compel agency action based on unreasonable delay, those two claims are "essentially the same," and courts generally analyze them together. *See, e.g.*, *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997).

The parties filed and briefed cross-motions for summary judgment. ECF Nos. 40, 41, 42, 44. After a hearing on August 25, 2026, the parties filed supplemental evidence and argument with the Court's permission. ECF Nos. 46, 47, 48, 49, 50-1, 54.

## III. LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630–31 (9th Cir. 1987). However, once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The Court therefore draws all reasonable inferences in favor of Plaintiff for the purpose of Defendant's motion, and all

United States District Court
Northern District of California

reasonable inferences in favor of Defendant for the purpose of Plaintiff's motion.

On summary judgment, the Court must consider whether the *contents* of evidence offered by the parties would be admissible at trial, even if evidence is not currently offered in a *form* that would be admissible. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

## IV. ANALYSIS

### A. *TRAC* Factors

As a threshold issue, Plaintiff "disagrees that [the] TRAC [factors] should be used in determine [sic] whether the delay is unreasonable, and proposes to use the unreasonableness standard provided in APA." ECF No. 41 at 20. Plaintiff argues that the D.C. Circuit's original *TRAC* case concerned "egregious" delay for the purpose of mandamus relief, and its standard therefore should not apply to the APA's reasonableness standard. *Id.* at 20–23. This argument is legally frivolous, at least as directed to this Court, because the Ninth Circuit has held in multiple binding, precedential opinions that the *TRAC* factors apply to unreasonable delay claims under the APA.

> To determine whether an agency's delay is unreasonable under the APA, we use the *TRAC* factors—the six-factor balancing test announced in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*"). *See Indep. Mining* [*Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997)]. The *TRAC* factors are:
>
> > (1) the time agencies take to make decisions must be governed by a "rule of reason";
> >
> > (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
> >
> > (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
> >
> > (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
> >
> > (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
> >
> > (6) the court need not find any impropriety lurking behind

> agency lassitude in order to hold that agency action is unreasonably delayed.

*Vaz v. Neal*, 33 F.4th 1131, 1137 (9th Cir. 2022) (quoting *TRAC*, 750 F.2d at 80, for the numbered list) (cleaned up); *see also Indep. Min. Co.*, 105 F.3d at 507 (9th Cir. 1997) ("We look to the so-called *TRAC* factors in assessing whether relief under the APA is appropriate." (footnote omitted)).

"Although the standard is hardly ironclad, and sometimes suffers from vagueness, it nevertheless provides useful guidance in assessing claims of agency delay[.]" *TRAC*, 750 F.2d at 80.

**1. Factor 1: Rule of Reason**

Many district court decisions have construed the first factor as focusing on *whether* there is some "rule" the agency uses to process applications, such as a "first in, first" out policy, and whether that rule is reasonable. *See, e.g.*, *Ray v. Cuccinelli*, No. 20-cv-06279-JSC, 2020 WL 6462398, at *8–9 (N.D. Cal. Nov. 3, 2020); *Nibber v. U.S. Citizenship & Immigr. Servs.*, No. CV 20-3207 (BAH), 2020 WL 7360215, at *5 (D.D.C. Dec. 15, 2020) (collecting cases).

Both parties here, but particularly Defendant, have addressed this factor using that framework: USCIS argues that Shpolyanskaya's declaration describes a reasonable process for adjudication, while Plaintiff argues that her somewhat vague declaration does not describe such a process and that other evidence suggests USCIS's pace of adjudication is unpredictable and arbitrary.

That is not, however, how the Ninth Circuit has addressed this factor. Instead, circuit precedent asks *courts* to apply a "rule of reason" to consider whether *the time taken for the agency action in question* has been reasonable:

> "The most important [*TRAC* factor] is the first factor, the 'rule of reason,' " *Community Voice*, 878 F.3d at 786 (citing *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)), under which we consider whether the time for agency action has been reasonable. Repeatedly, courts in this and other circuits have concluded that "a reasonable time for agency action is typically counted in weeks or months, not years." Id. at 787 (quoting In re Am. Rivers & Idaho Rivers United, 372 F.3d 413, 419 (D.C. Cir. 2004)). On this issue, "the more developed law of the District of Columbia Circuit," id. at 782, has held that a "six-year-plus delay is nothing less than egregious." Rivers United, 372 F.3d at 419; see also Core Commc'ns,

> 531 F.3d at 857 (six year delay unreasonable); In re Bluewater Network, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (nine year delay unreasonable); In re Int'l Chem. Workers Union, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (per curiam) (six year delay unreasonable).
>
> Our own case law is no different. In Pesticide Action Network, we unanimously held that the rule of reason "tipped sharply in favor" of petitioners where, after eight years, the EPA had not issued a final response to an administrative petition requesting cancellation of the organophosphate pesticide chlorpyrifos. 798 F.3d at 814. . . .

*In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020).

> The first factor considers "whether the time for agency action has been reasonable." *Nat. Res. Def. Council, Inc. v. EPA*, 956 F.3d 1134, 1139 (9th Cir. 2020). It is the "most important" factor, "though it, like the others, is not itself determinative." *A Cmty. Voice v. EPA*, 878 F.3d 779, 786 (9th Cir. 2017). Assuming the EOIR has still not completed its investigation of Vaz's complaint (filed in May 2018), Vaz has been waiting about four years. "Repeatedly, courts in this and other circuits have concluded that 'a reasonable time for agency action is typically counted in weeks or months, not years.' " *Nat. Res. Def. Council*, 956 F.3d at 1139 (quoting *A Cmty. Voice*, 878 F.3d at 787). We assume without deciding that the first factor would weigh in Vaz's favor.

*Vaz v. Neal*, 33 F.4th 1131, 1138 (9th Cir. 2022).

In the context of Ninth Circuit precedent, this factor is therefore best understood as asking holistically whether the delay is reasonable. That might involve a determination of facially "egregious" delay, *Rivers United*, 372 F.3d at 419, consideration of general axioms of "weeks or months, not years," *see Nat. Res. Def. Council*, 956 F.3d at 1139, reference to a Congressional indication of an appropriate schedule under the second factor (which specifically notes its application to the first factor, *TRAC* 750 F.2d at 80), or other relevant considerations. This inquiry arguably subsumes the other factors, but it is not clear from the D.C. Circuit's original *TRAC* opinion—or Ninth Circuit precedent applying it—that the factors are intended to be wholly independent of each other. The second factor's statement that a Congressional timetable "may supply content for this rule of reason" makes clear that at least those two factors relate to and inform each other.

"What constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case. Courts typically consider the source of the delay, including the complexity of the investigation and the extent to which each party



United States District Court
Northern District of California

United States District Court
Northern District of California

contributed to the delay." *Doe v. Risch*, 398 F. Supp. 3d 647, 655–56 (N.D. Cal. 2019) (citations and internal quotation marks omitted). The extent to which the agency applies a rational framework to prioritize and adjudicate applications, though not (as USCIS contends) the core of this factor, is also relevant to this holistic inquiry. The parties here also address typical and historical processing time, which bears some relevance as well. The Court therefore addresses these and other potentially relevant considerations within the holistic inquiry of the "rule of reason" before turning to the other specifically enumerated *TRAC* factors.

**a. Facial Reasonableness**

The Ninth Circuit (along with other circuits) has repeatedly recognized that "a reasonable time for agency action is typically counted in weeks or months, not years." *Vaz*, 33 F.4th at 1138; *Nat. Res. Def. Council*, 956 F.3d at 1139. In the absence of justification, the two-and-a-half year period that Plaintiff's application has been pending therefore weighs in Plaintiff's favor towards a finding of unreasonable delay, though it is by no means dispositive. *See Vaz*, 33 F.4th at 1138 (finding a four-year delay in adjudicating a complaint against an immigration attorney "not unreasonable under the *TRAC* factors" despite assuming that the first factor weighed in favor of the plaintiff).

Some district courts have stated that "in the immigration context, courts typically hold that a delay of less than four years is not considered unreasonable." *E.g.*, *Taherian v. Blinken*, No. 8:23-cv-01927-RGK-ADS, 2024 WL 7020315, at *2 (C.D. Cal. Nov. 22, 2024) (citing *Zafarmand v. Pompeo*, No. 20-cv-00803-MMC, 2020 WL 4702322, at *7 (N.D. Cal. Aug. 13, 2020); *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1071–72 (N.D. Cal. 2014)). That observation originated in Judge Seeborg's *Islam* decision, which surveyed the narrow class of cases where "USCIS impose[d] a 'hold' pursuant to apparent findings of terrorism-related inadmissibility." *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1071 (N.D. Cal. 2014); *see also Zafarmand*, 2020 WL 4702322, at *7 (finding that applications requiring waivers related to public safety and national security were not materially different from the terrorism-hold cases addressed in *Islam*). There is no argument or evidence that such considerations apply to Plaintiff's application here. In other contexts, courts have found delays shorter than four years unreasonable. *See, e.g.*, *Doe*, 398 F. Supp. 3d at 657 ("[C]ourts in

United States District Court
Northern District of California

this district have found that, 'under normal circumstances, a delay of approximately two years [to adjudicate an immigration benefit application] due to an uncompleted FBI background check is unreasonable as a matter of law.'" (quoting *Chen v. Chertoff*, No. C 07-2816 MEJ, 2008 WL 205279, at *3 (N.D. Cal. Jan. 23, 2008))).

**b. USCIS's Process**

USCIS relies on a declaration of Section Chief Aleksandra Shpolyanskaya describing its process for adjudicating I-485 applications, which reads in relevant part as follows:

> 4. USCIS adjudicates applications through a stardized [sic] process that generally involves the same stages of review for each application. However, the pace of adjudication may vary depending on the circumstances of an individual case and operational factors described below.
>
> 5. Throughout USCIS, each field office has its own production goals, filing volume, and staffing levels, which influence the pace of adjudications.
>
> 6. After an application is properly filed, applicants are scheduled for a biometrics appointment at their local Application Support Center to provide fingerprints, photos, and a signature. USCIS uses biometrics to verify applicants' identities and to conduct required background and security checks.
>
> 7. Background and security checks are conducted by a third-party law enforcement agency and the processing timeframe is not within USCIS control.
>
> 8. After the checks are complete, USCIS officials review an applicant's case to determine whether an interview is necessary. Not all applicants require an interview. If USCIS schedules an applicant for an interview, the applicant must appear at a USCIS office to answer questions under oath or affirmation regarding their Form I-485. In some instances, the facts and circumstances of a case require a second interview.
>
> 9. USCIS may send applicants a request for additional evidence ("RFE") if they did not submit all the required evidence; the evidence submitted is no longer valid; or the officer needs more information to determine an applicant's eligibility. An RFE may be issued before an interview, at the time of interview, or after an interview.
>
> 10. When USCIS determines that an applicant is inadmissible and a waiver is available, an applicant may submit a Form I-601, Application by Refugee for Waiver of Inadmissibility Grounds. A Form I-602 is a secondary adjudication that must occur before the I-485 can be adjudicated.
>
> 11. At any stage of the adjudication, if USCIS identifies any

> indicators of fraud, national security concerns, or threats to public safety, USCIS may refer the case for further review.
>
> 12. When USCIS makes a decision on an application, applicants will receive a written decision notice. If USCIS approves an application, applicants will receive an approval notice first and receive their actual Permanent Resident Card (Green Card) separately. If USCIS denies an application, the decision notice will outline the reasons for the denial and whether they may appeal the decision.
>
> 13. The interplay of these operational and case-specific factors influences the pace of adjudication for each individual application.

ECF No. 40-1; *see also* ECF No. 46-1 (corrected copy with signature).

Shpolyanskaya's declaration does not explain how USCIS chooses which applications to complete in what order—whether first-in-first-out (processing applications in the order they are received), last-in-first-out (the opposite system, which USCIS has at times used for certain types of applications to attempt to deter frivolous applications by quickly denying them),[2] or some other method of prioritization. Nor does she address whether any of the potential reasons for delay or further screening apply to Plaintiff's application here—or indeed, any information related to Plaintiff specifically. Shpolyanskaya instead describes a highly case-specific method of processing applications, which appears to leave much to the discretion of a reviewer and the circumstances of a particular office.

In a supplemental declaration, Shpolyanskaya states that USCIS is awaiting security check information relevant to Plaintiff's application "from another government agency," and has followed up with that agency six times from June 15, 2026 to August 24, 2026. ECF No. 46-2, ¶¶ 23–25. USCIS has not identified what agency that is, whether USCIS is required to consult with that agency before resolving I-485 applications or does so routinely, what information USCIS is seeking, why that information is necessary here, or when USCIS first requested that information after Plaintiff filed his application in early 2024. Shpolyanskaya's declaration regarding that other agency therefore sheds little light on the reasonableness of the delay.

In the absence of clearer explanation of how that system has been applied to Plaintiff's

[2] *See S. Y. v. Sec'y of the Dep't of Homeland Sec.*, No. 25-cv-01017-YGR (LJC), 2026 WL 1896219, at *3 (N.D. Cal. July 1, 2026).

United States District Court
Northern District of California

application or what considerations Plaintiff's application implicates, this declaration does not demonstrate that USCIS has followed a reasonable process towards timely adjudication of that application. But neither does it suggest that USCIS's case-specific approach is facially unreasonable, or that USCIS has acted unreasonably with respect to Plaintiff's application specifically. Plaintiff has not offered any other evidence to show that USCIS has applied an unreasonable process. USCIS's process for adjudicating Plaintiff's application, or I-485 applications more generally, therefore, does not weigh in favor of either side.

**c. Source of Delay**

At the hearing, Plaintiff's counsel suggested that the *TRAC* framework is unsuited to review of delay under the APA because it does not account for important factors like the source of the delay. As noted above, however, binding Ninth Circuit precedent has squarely endorsed *TRAC*'s applicability to APA review, *Vaz*, 33 F.4th at 1137, and courts have considered the source of delay as a component of overall reasonableness, *Doe*, 398 F. Supp. 3d at 655–56. Here, the parties have offered only limited evidence as to the reason Plaintiff's application has taken more than two and a half years to adjudicate. USCIS does not contend that Plaintiff has done anything to cause the delay. And though Shpolyanskaya's first supplemental declaration notes that USCIS is awaiting information from another agency, as discussed above, she has offered insufficient information to assess whether any delay caused by that consultative process is fairly attributable to USCIS.

Plaintiff (primarily in the context of the sixth factor, addressing impropriety) suggests that USCIS has created artificial obstacles. He notes social media posts by Defendant Edlow indicating that USCIS "may" slow processing of benefit applications during a lapse in appropriations, which Plaintiff contends was improper because USCIS is funded by fees rather than appropriations. ECF No. 44 at 18 (citing ECF No. 1-3, an attachment to Plaintiff's Complaint). Despite an administrative record now having been filed, ECF No. 39, Plaintiff has not offered any evidence that USCIS in fact ceased or slowed processing of his application during the government shutdown, nor is the Court aware of any effort by Plaintiff to take discovery on that subject.

Plaintiff cites previous policy memoranda—which have since been vacated as unlawful by the District of Rhode Island[3]—that barred final adjudication of immigration benefit applications from nationals of certain countries, including Iran. ECF No. 44 (citing ECF Nos. 16-1 (PM-602-0192); 16-2 (PM-602-0194); 16-3 (email from USCIS to Senator Adam Schiff's office describing one of those memoranda)).[4] As this Court previously noted in denying USCIS's Motion to Dismiss, the "'hold' imposed by PM-0192 and PM-0194 'allow[ed] a case to proceed through processing, up to final adjudication,'" including allowing USCIS to conduct Plaintiff's interview while those memoranda remained operative. ECF No. 32 at 9 (quoting ECF No. 16-2 (PM-0194) at 1 n.2) (emphasis omitted). Plaintiff has offered no evidence showing specifically that those memoranda, which barred only final adjudication of his application, delayed it proceeding towards a final adjudication that has not yet occurred.

Shpolyanskaya's supplemental declaration states that a "a backlog of applications that accrued during the hold period" set by those policy memoranda has contributed to increased processing times, and that "the adjudication of Plaintiff's case resumed in the normal course of business" after the District of Rhode Island vacated those memoranda. ECF No. 46-2, ¶¶ 17, 22. Shpolyanskaya also states that USCIS first followed up with another agency regarding Plaintiff's application on June 15, 2026, which was shortly after the District of Rhode Island's decision on June 5, 2026. Those statements call into question whether the USCIS's previous representations regarding continued processing of Plaintiff's application during the unlawful "hold period" were accurate.

Plaintiff notes that on May 21, 2026, USCIS issued Policy Memorandum No. PM-602-0199, titled "Adjustment of Status is a Matter of Discretion and Administrative Grace, and an Extraordinary Relief that Permits Applicants to Dispense with the Ordinary Consular Visa

[3] *Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.*, 834 F. Supp. 3d 242 (D.R.I. June 5, 2026).

[4] Plaintiff also cites some unidentified applicant's chat transcript, at some unidentified time, with a USCIS customer service representative, in which the representative indicated that there was no option for that applicant to expedite their application based on their country of origin. ECF No. 44 at 18 (citing ECF No. 16-4). Without more information, the Court discerns no apparent relevance of that chat transcript to Plaintiff's application here.

Process." ECF No. 41-7; *see* ECF No. 44 at 18. That memorandum instructs USCIS officers to treat most applicants' choice to pursue adjustment of status within the United States rather than returning to a foreign country to pursue "the ordinary consular immigrant visa process" as an "adverse factor[]" weighing against adjustment of status. *Id.* at 4–5. The memorandum acknowledges, however, that an expectation to pursue to the consular process would not apply to "immigrant categories where only adjustment of status provides a pathway to permanent resident status." *Id.* at 4. Though it does not specify such categories, they presumably include asylees like Plaintiff, who by definition cannot safely return to their countries of origin.[5] The memorandum concludes by instructing officers to consider all relevant factors and to explain their decisions. *Id.* at 5–6. Notwithstanding Plaintiff's characterization of this memorandum as a "General Hold Policy," ECF No. 41 at 12, it does not instruct officers to delay their decisions or otherwise address the pace of adjudication. There is no evidence that this third memorandum has contributed to delay in adjudicating Plaintiff's application.

The absence of clear evidence that either side has unreasonably caused the delay renders this factor relatively neutral, though there is some ambiguous evidence suggesting that USCIS bears blame for delaying processing Plaintiff's application during the "hold period" set by the unlawful policy memoranda that purported to bar only final adjudication. Even setting aside that potentially disputed question of fact, where there is no "evidence that the investigation is especially complex" and USCIS has not argued that Plaintiff contributed in any way to the delay, this consideration weighs in favor of finding a two-and-a-half- year delay unreasonable. *See Doe*, 398 F. Supp. 3d at 656.

**d. Time to Process Other Applications**

Both parties address statistics regarding USCIS processing times for other I-485 applications to adjust status.

[5] Asylees also would not fall within categories of nonimmigrants who purportedly "generally apply for adjustment of status after the expiration of their period of admission or parole, or after violating the terms and conditions of their admission or parole," or who "fail to maintain their nonimmigrant or parole status while their adjustment of status applications are pending." *See* ECF No. 41-7 at 4–5 n.18; *cf.* ECF No. 38 at 130 (stamp indicating Plaintiff's asylum status was "Granted Indefinitely").

Plaintiff cites various metrics and analysis from a website called MyCasesHub, which Plaintiff contends show that nearly all of the I-485 applications submitted around the same time as his own—87 out of 93 other such applications—have been resolved, with an average of 7.2 months for those cases that were resolved. ECF No. 41-2 at 1–2; *see also* ECF Nos. 41-3, 41-4, 44-2. According to the screenshots Plaintiff provides, "MyCasesHub is not affiliated with USCIS," *see, e.g.*, ECF No. 41-2 at 6, but "checks the USCIS case status system on a regular cadence and stores each response," in order to provide applicants with information on the status of their application and other applications, such as applications in a "cohort" of "others filed around the same time with the same form and service center," ECF No. 44-2.

USCIS correctly objects that all of the information Plaintiff presents from this website, including the website's explanation of how the information is gathered, is hearsay: out-of-court statements presented for the truth of the matter asserted. Fed. R. Evid. 801(c). There is no evidence to indicate who created and maintains this website, whether the information provided is genuine and accurate, or whether Plaintiff would have any way to present it at trial using admissible evidence. *See*, *e.g.*, Fed. R. Civ. P. 56(c)(2), (4) (addressing the presentation of evidence at summary judgment through declarations and in material that could be presented at trial in an admissible form); Fed. R. Evid. 802 (providing that hearsay is generally inadmissible); Fed. R. Evid. 901 (requiring evidence to be authenticated at trial). Perhaps Plaintiff would be able to substantiate this evidence at trial and admit it through expert testimony or a declaration from someone responsible for compiling it. Because Plaintiff has thus far made no showing that he would be able to do so, however, the Court disregards all of Plaintiff's exhibits from the MyCasesHub website for the purpose of resolving the present Motions.

Both parties also cite case statistics published by USCIS, which both parties could likely present in admissible form at trial—Plaintiff as statements of a party opponent, USCIS through authentication by a suitable employee witness familiar with those statistics, and perhaps also both parties through judicial notice of matters of public record (though that doctrine might be limited to the mere fact of USCIS's publication rather than the truth of the representations, if their accuracy

were disputed). Plaintiff notes that historic median processing times[6] for I-485 applications based on a previous grant of asylum were 13.4 months in Fiscal Year 2024 and 10.3 months in Fiscal Year 2025. ECF No. 41 at 11 (citing ECF No. 41-1). Plaintiff's evidence shows significant variation in other recent years, including median processing times of 22.6 months in Fiscal Year 2022, 22.9 months in Fiscal Year 2024, and 17.2 months for whatever portion of Fiscal Year 2026 is captured in the data provided.[7] All of those are less than the thirty months Plaintiff's application has now been pending, but as USCIS notes, those figures are only the medians for each year, so "half of the cases took longer than the stated times." ECF No. 42 at 5.

USCIS cites its own website that, at the time of USCIS's August 12, 2026 reply-and-opposition brief, purportedly showed that 80% of asylum-based I-485 applications that USCIS resolved in the last six months were resolved within 32.5 months after they were filed. ECF No. 42 at 5 (citing *Case Processing Times*, USCIS, https://egov.uscis.gov/processing-times (last accessed Aug. 12, 2026)). Shpolyanskaya's supplemental declaration filed September 1, 2026 states that the processing time for 80% of such applications had increased to 34 months.

This data suggests that Plaintiff's application is currently around the point where most applications have been completed but a significant portion have not. It is not possible to tell from USCIS's data how that compares to historic processing times, because USCIS does not seem to publish the 80% figure except as a live-updating metric, and the median figures that USCIS publishes for historic data does not provide any way to determine the variability or standard deviations of processing times.[8] Though not cites by the parties, however, anecdotal references to

---

[6] The time in which fifty percent of cases were resolved after filing. *See* ECF No. 41-1 at 1.
[7] Fiscal Year 2026 will not end until September 30, 2026.
[8] Plaintiff offers a belated expert report with his reply brief in which expert witness Dr. Jordan Ragusa (a political science professor) makes that observation, ECF No. 44-1 at 5–8, but that limitation of the data—or at least the data available in the record of this case—would be apparent even without that report. Ragusa makes similar observations about the limits of the 80% metric, *id.* at 9–14, but that is less relevant to this case when the current timing of Plaintiff's application falls so close to the current 80% value that it is relatively clear at least roughly where his application stands in the distribution. And while Ragusa suggests there is some ambiguity as to whether USCIS's 80% figure represents the *median* of the fastest-processed 80% of cases or the time within which all of those fastest 80% were completed, it is clear from USCIS's description that it means the latter. Ragusa also opines that there has been a slowdown in processing of all immigration benefit applications in 2026, ECF No. 44-1 at 14–18, but because he does not address I-485 applications specifically in his report, that section has at most minimal relevance to this



United States District Court
Northern District of California

the same figure in other cases suggest that the current metric of 34 months to resolve 80% of asylum-based I-485 applications is not an outlier for recent years. *See Elnaggar v. Garland*, No. 23 CIV.10850 (GS), 2025 WL 70386, at *6 n.2 (S.D.N.Y. Jan. 10, 2025) (noting 32 months as of May 2024); *Aydemir v. Garland*, No. 22-CV-100 (PAC), 2022 WL 4085846, at *3 (S.D.N.Y. Sept. 6, 2022) (noting 40.5 months as of August 2022); *Liu v. Denayer*, No. CV-216653-DMG (MRWx), 2022 WL 17370527, at *4 (C.D. Cal. July 18, 2022) (noting the same in January 2022).

The fact remains that Plaintiff's application appears to have been pending significantly longer than the majority of similar applications, with no clear end in sight. Shpolyanskaya's declaration suggests that longer processing times are usually based on "operational and case-specific factors" like a particular field office's "filing volume[] and staffing levels" or "indicators of fraud, national security concerns, or threats to public safety." ECF No. 40-1, ¶¶ 4, 5, 11, 13. Her supplemental declaration states that the "San Francisco Field Office has been significantly understaffed for more than one year," but also that "staffing is an ongoing challenge across all field offices." ECF No. 46-2, ¶ 17. There is no evidence that any particular consideration along those lines has contributed to the delay in resolving Plaintiff's application as compared to other applications, in a manner that might justify that delay. The absence of such evidence, when Plaintiff's application is already towards the higher end of USCIS's processing times, weighs somewhat in favor of a finding of unreasonableness, though not as strongly as if Plaintiff's processing time fell further from the mainstream.

* * *

Overall, considerations relevant to the first factor's "rule of reason" (and not more specifically captured by other factors below) range from neutral to slightly favoring a finding of unreasonable delay.

**2. Factor 2: Congressional Timetable**

An amendment to the INA enacted in 2000 provides: "It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after

---

case. The Court therefore need not decide whether to disregard Ragusa's report as untimely, because it does not meaningfully affect the outcome of the present motions.

United States District Court
Northern District of California

the initial filing of the application, except that a [particular visa application not at issue here] should be processed not later than 30 days after the filing of the petition." 8 U.S.C. § 1571(b).

Some courts have suggested this "aspirational" timeline is not relevant to the *TRAC* analysis because it is not a mandatory deadline. *E.g.*, *Shahijani v. Laitinen*, No. 2:23-cv-03967-RGK-MRW, 2023 WL 6889774, at *4 (C.D. Cal. Oct. 6, 2023). The Central District's decision in *Shahijani* cites a Ninth Circuit case holding that "similar 'sense of Congress' language is 'non-binding, legislative dicta,'" *id.*, but that Ninth Circuit decision addressed an entirely unrelated question of whether a particular statute had "restore[d] food stamp benefits to Hmong veterans," *Yang v. Cal. Dep't of Soc. Servs.*, 183 F.3d 953, 961 (9th Cir. 1999).

Here, this *TRAC* factor specifically inquires whether "Congress has provided a timetable or other *indication* of the speed with which it *expects* the agency to proceed in the enabling statute." *TRAC*, 750 F.2d at 80. If this factor looked only to mandatory deadlines, there would be little reason to address any other question of reasonableness: either the agency complied with its legal obligation, or it did not. *See, e.g.*, *S.F. Baykeeper v. U.S. Fish & Wildlife Serv.*, No. 25-cv-01360-LJC, 2025 WL 2528687, at *6–8, *11 (N.D. Cal. Sept. 3, 2025) (finding a violation of a mandatory deadline under the Endangered Species Act and ordering injunctive relief without addressing broader questions of reasonableness). An aspirational timeline like the one stated in § 1571(b) is not dispositive, but it informs the question of reasonableness in the *TRAC* framework.

Accordingly, courts have held that "[e]ven though the language is insufficient to set a deadline, [courts] can look to Congress's aspirational statement as a ruler against which the agency's progress must be measured." *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 344 (D.C. Cir. 2023) (cleaned up). "Although § 1571(b) is merely precatory, this provision nonetheless suffices to 'tip the second *TRAC* factor in [Plaintiffs'] favor." *Doe*, 398 F. Supp. 3d at 657 (quoting *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1073 (N.D. Cal. 2014)). Here, as in *Doe*, "approximately 900 days have elapsed since the filing of Plaintiff['s] petition, which is five times longer than the 180-day benchmark set forth in § 1571(b)." *Id.*

**3. Factors 3 and 5: Nature of the Case and Prejudice from Delay**

Courts often address together the third and fifth factors, which concern the nature of the

interests at issue and the harm that would result from further delay. This case does not concern purely economic interests that courts have treated as a relatively low priority for agency action; Plaintiff has a meaningful interest in pursuing a secure permanent residence in the country where he has established his life. But nor does the case implicate threats to anyone's health or physical welfare. Though an immigration judge determined (by granting Plaintiff asylum) that he would face persecution if he returned to Iran, he has a right to remain and work in the United States as a result of that status. There is no indication he is at risk of losing those rights while his application remains pending. Nor has Plaintiff presented evidence that he has family members in danger abroad who are in need of sponsorship for reunification in the United States, though he states in a declaration that he has been unable to visit family in Canada. This case is therefore distinguishable from cases involving applications for reunification of an asylee's family like *Doe*, where delay may place the absent family member at risk of persecution. 398 F. Supp. 3d at 57–58.

Plaintiff initially offered only conclusory assertions of any concrete harm from this delay, unsupported by evidence of any kind. Citing only his Complaint and previous briefing, he contended that he "is significantly constrained by his ability to travel, . . . his lack of permanent status is a significant obstacle to his professional development," and he "has been forced to forgo job offers due to the Defendant's hold, and has had his career significantly disrupted." ECF No. 44 at 17; *see also* ECF No. 41 at 27. His supplemental declarations explain that though he has at times held Refugee Travel Documents, he has faced delays in receiving them, he has been denied admission to Canada where members of his family live, he fears traveling internationally without permanent resident status, and he has been told that the lack of such status disadvantages him in seeking loans or mortgages, in addition to causing him more general fear and uncertainty. ECF Nos. 47-1, 50-1. He also notes that he is not able to maintain Real ID-compliant identification, but it is not clear if that has concrete consequences for his ability to travel (or otherwise). *See* ECF No. 47-1, ¶ 6; ECF No. 50-1, ¶ 8. Shpolyanskaya's second supplemental declaration states that Plaintiff has at times held Refugee Travel Documents and employment authorization, but also that those authorizations have been intermittent, reinforcing that Plaintiff's current status imposes

practical and administrative burdens. ECF No. 49-1, ¶¶ 4–8. Plaintiff explains that when he applied for a Refugee Travel Document in November 2023 in the hope of meeting his soon-to-be-born niece in Canada, he did not receive that document for more than a year until January 2025. ECF No. 50-1, ¶ 4. Canada then denied him entry, due in significant part to his lack of permanent resident status in the United States. *Id.* ¶ 5.

USCIS overreaches on this factor, suggesting that Plaintiff actually faces potential harm from a *resolution* of his application. USCIS cites Judge Kim's observation that an asylum applicant facing delay was "worse off than she would be if her application were adjudicated and granted," but "better off than she would be if her application were adjudicated and denied." *Kurt v. Mayorkas*, No. 24-cv-02792-SK, 2024 WL 5161950, at *5 (N.D. Cal. Dec. 18, 2024); *see* ECF No. 42 at 6. That is true in the context of asylum applicants, who "can receive certain benefits, such as employment authorization," while their applications are pending, at least under some circumstances. *Kurt*, 2024 WL 5161950, at *1; *see also id.* at *5; 28 U.S.C. § 1158(d)(2).

Here, though, Plaintiff has already been granted asylum, which authorizes him to remain and work in the United States indefinitely. "[A]sylees are employment eligible incident to their status and are authorized to work indefinitely because their immigration status does not expire." USCIS, Handbook for Employers M-274, § 7.3: Refugees and Asylees, *available at* https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/70-evidence-of-employment-authorization-for-certain-categories/73-refugees-and-asylees [https://perma.cc/UVE9-MEB5]. USCIS has not identified any relevant benefit Plaintiff receives from a *pending* I-485 application to adjust status that he would lose if it were denied.

If Plaintiff's pending application were granted, he would receive additional rights and assurances as a permanent resident, and would then be able to pursue naturalization with all of the rights attendant thereto. If it were denied, it is not clear from the record before the Court that he would be worse off by any practical measure than his current state of limbo while the application remains pending.

This factor weighs somewhat in Plaintiff's favor, but not overwhelmingly so when Plaintiff holds many of the same privileges as an asylee that he would as a permanent resident, albeit with a

United States District Court
Northern District of California

greater degree of uncertainty and more bureaucratic obstacles towards exercising those privileges.

**4. Factor 4: Competing Priorities**

USCIS assert that "expediting Plaintiff's case would necessarily adversely impact the adjudications of other individuals who are ahead of Plaintiff in that process," ECF No. 42 at 4, but USCIS cites only Shpolyanskaya's declaration, which does not say that, ECF No. 40-1; *see also* ECF No. 46-2 (supplemental declaration). USCIS disclaims any particular order of processing based on when applications were filed, and it has not specified any other prioritization system it uses to determine which applications are processed first. *See* ECF No. 42 at 4 ("While historically the agency had applied what was described as a 'first-in, first-out' system, the current approach reasonably accounts for a wide range of variables that can alter processing times in individual cases."). It is conceivable that Plaintiff's application has been arbitrarily shelved rather than waiting behind other applications that have some claim to higher priority, or that USCIS has assigned officers who could be reviewing Plaintiff's application to other tasks unrelated to any immigration benefit applications, or that resolution of Plaintiff's application would at this point require only ministerial sign-off that would not meaningfully delay any other work.[9]

Here, as in *Doe*, USCIS has not "establish[ed] that there is a queue, . . . let alone [Plaintiff's] place therein," and USCIS's "bald assertion that expediting Plaintiff['s] application would divert resources to this case to the detriment of other duties" or applications rings hollow when USCIS has not "identif[ied] those other duties [or applications] or ma[de] any effort to" describe a system of priority. *Doe*, 398 F. Supp. 3d at 658. This factor weighs in favor of Plaintiff, though not as heavily as it might if Plaintiff had offered affirmative evidence that his application could be completed without diverting resources from other worthy agency priorities.

[9] Similarly USCIS asserts in its reply-and-opposition brief that it faces "an enormous backlog of adjustment and other immigration-benefit applications that themselves need to be processed," but cites no evidence for that proposition. ECF No. 42 at 5. The Court declines to afford any weight to that bare assertion. But even if it were true (as it likely is) the purported fact that USCIS has accumulated an "enormous backlog" of applications could arguably suggest that USCIS is not processing even applications that are resolved at its currently typical rates within a reasonable amount of time—much less Plaintiff's, which currently stands near the 80% mark as discussed above.

### 5. Factor 6: Impropriety

"[T]he court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80 (cleaned up).

In addition to materials discussed above in the context of the source of delay (e.g., the various USCIS policy memoranda), Plaintiff also cites the controversial "Project 2025" report by the Heritage Foundation laying out goals for conservative governance, specifically a recommendation "that USCIS should delay taking cases." ECF No. 41 at 31. Plaintiff notes that the portion of the report at issue was authored by Ken Cuccinelli, who served in senior roles at DHS and USCIS during the first Trump administration, but as far as the Court is aware, Cuccinelli has held no such roles since the report's publication and since Plaintiff filed his application. Moreover, the portion Plaintiff cites states that "USCIS should pause the intake of applications in a benefit category when backlogs in that category become excessive," and when "USCIS adjudicators can decrease that caseload to a manageable number, application intake should resume." ECF No. 41-5 at 8. That is not a recommendation that USCIS should delay adjudication of applications already submitted. Plaintiff has not offered any evidence that USCIS is implementing this recommendation prepared by an advocacy group outside of the agency, much less that it is intentionally creating an intentional artificial backlog in order to then pause intake of further applications.[10]

Plaintiff also cites a recent report from the media outlet The Hill that DHS General Counsel James Percival has been accused of ethical violations for disparaging federal judges. ECF No. 44-3. That accusation does not evince impropriety in USCIS's handling of Plaintiff's application.

As discussed above, USCIS has presented ambiguous statements as to whether the unlawful policy memoranda imposing a hold on adjudication of certain applications contributed to

[10] There is public controversy as to the broader question of the extent to which Project 2025 has informed the current administration's policies, but this case must be decided on evidence in the record, and Plaintiff has not provided evidence that USCIS is delaying his application for the purpose of creating an artificial backlog. News reports discussing implementation of *other* recommendations in the Project 2025 report are not cognizable evidence to support this theory. *Cf.* ECF No. 44 at 9 n.3 (citing a PBS Newshour report).

United States District Court
Northern District of California

the delay in resolving Plaintiff's application. If so, such delay could constitute impropriety that would weigh in favor of finding the overall delay unreasonable. The record on that question is not sufficiently clear to resolve on summary judgment, however, and the Court has not identified any other evidence of impropriety.

**B. Outcome**

Of the considerations addressed above, most weigh somewhat in Plaintiff's favor, but only weakly so. Plaintiff has waited longer than Congress intended and longer than most applicants for similar benefits, but not far outside either the current or recent historical mainstream. His interest in securing his residence and proceedings towards naturalization is more than merely economic, and there is at least some evidence (i.e., Plaintiff's declarations) that his current status has interfered with his ability to travel, but he has not identified evidence of threats to his health or physical welfare. There is no indication that Plaintiff contributed in any way to the delay, but nor has Plaintiff offered evidence that USCIS handled his application unreasonably beyond the mere fact of how long it has been pending. There is no evidence one way or the other as to whether expediting Plaintiff's application would delay others that have been pending longer or have some other claim to higher priority.

Given that equivocal record, an intermediate approach is appropriate, at least for now. "Sometimes the right answer is to grant relief with a light touch—for example, by requiring periodic progress reports and reserving the possibility of 'additional appropriate relief' in the future." *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 819 (D.C. Cir. 2024) (citing *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 556 (D.C. Cir. 1999)). The Court therefore ORDERS the parties to meet and confer and file a joint status report no later than October 26, 2026, attaching a declaration from USCIS regarding the current status of Plaintiff's application. If USCIS is still waiting for information from another agency, it must identify the agency and the information it is seeking. If there are other applications pending with the same field office that USCIS considers higher priorities, it must identify how many and when they were filed.

If the application has not yet been resolved at that time, the Court will set a case management conference to set a date for a bench trial, so that the Court can resolve inconsistencies

(including as to the effect of the unlawful adjudicative hold) and provide a clearer record for final resolution of this case.

Both parties' Motions for Summary Judgment are DENIED except as to the limited relief ordered above.

## V. CONCLUSION

For the reasons discussed above, the parties are ORDERED to meet and confer and file a joint status report no later than October 26, 2026, including a declaration from USCIS regarding the current status of Plaintiff's application. Except for that limited relief, both parties' Motions for Summary Judgment are DENIED. The Court will resolve this case through a bench trial if Plaintiff's application is not resolved by the time of the parties' status report or otherwise before trial.

**IT IS SO ORDERED.**

Dated: September 25, 2026

LISA J. CISNEROS
United States Magistrate Judge